## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| **WHITESELL-GREEN, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action File No.** |
| **vs.** | ) | |
| | ) | |
| **ZURICH AMERICAN INSURANCE** | ) | |
| **COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT FOR DAMAGES

**COMES NOW** Plaintiff, Whitesell-Green, Inc. ("WGI"), by and through its undersigned counsel of record and pursuant to Fed. R. Civ. P. 3 and 4, and N.D. Fla. Loc. R. 5.1, and hereby files this Complaint for Damages ("Complaint") against Defendant, Zurich American Insurance Company ("Zurich"), showing this Court as follows:

## PARTIES, JURISDICTION, AND VENUE

### 1.

WGI is a Florida Profit Corporation organized and existing under the laws of the State of Florida, with its principal place of business being located at 240 North Tarragona Street, Escambia County, Pensacola, Florida 32502.

2.

Based on information and belief, Zurich is an insurance company incorporated in New York with its principal place of business being located at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007-2366. Zurich may be served with process by serving its Florida Registered Agent, Chief Financial Officer, at 200 East Gaines Street, Tallahassee, Florida 32399, or by such other means as provided for by the Federal Rules of Civil Procedure.

3.

This Court has subject matter jurisdiction over this action under 28 U.S.C.A. § 1332(a)(1) because WGI (Florida) and Zurich (New York) are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Therefore, this action satisfies the amount-in-controversary requirements for involving this Court's diversity jurisdiction.

4.

This Court has personal jurisdiction over Zurich as Zurich transacts business and issues policies within the State of Florida; and has contractual involvement with the project which is the subject matter of this action being in Pensacola, Florida. The exercise of jurisdiction over the parties will not violate due process because WGI's causes of action against Zurich grow out of Zurich's purposeful contact with the State of Florida through the General Liability Policy that Zurich issued to its insured,

WGI, covering the project which is the subject matter of this action being located in Pensacola, Escambia County, Florida.

5.

Venue is proper in this District under 28 U.S.C.A. § 1391(b)(1) and (2) as WGI and Zurich both reside in Pensacola, Escambia County, Florida with a substantial part of the events or omissions giving rise to WGI's claims against Zurich having occurred in this District with the project also being situated in Pensacola, Escambia County, Florida.

## FACTUAL BACKGROUND

### A.   The Contracts And Project

6.

In 2015, WGI entered into a Prime Contract with NAVFAC or the Department of the Navy (the "Navy") for WGI to serve as the general contractor for an extensive renovation of the Bachelor's Quarters Naval Station Barracks, located at 440 Roberts Avenue, Pensacola, Escambia County, Florida 32511-5136 (also known as Corry "A" Station) Buildings 3709 and 3710, with each Building consisting of three floors (the "Project").

7.

On or about January 13, 2015, WGI, as the general contractor, entered into a Subcontract Agreement with Sheet Metal Masters, Inc. ("SMM") for SMM to

provide **STEEL ERECTION** ("Steel Erection Work") for the Project.  A true and correct copy of the Steel Erection Subcontract Agreement entered into between WGI and SMM is attached hereto and is incorporated herein by reference as **Exhibit 1**.

8.

On January 13, 2015, WGI, as the general contractor, also entered into a Subcontract Agreement with SMM for SMM to provide **STANDING SEAM METAL ROOF & LIGHT GUAGE METAL TRUSSES** ("Metal Roof Work") for the Project.  A true and correct copy of the Metal Roof Work Subcontract Agreement entered into between WGI and SMM is attached hereto and is incorporated herein by reference as **Exhibit 2**.

9.

On or about January 26, 2015, WGI entered into a Subcontract Agreement with E Kelly Enterprises, Inc. ("EKE") for EKE to provide: "all supervision, labor, materials, equipment, tools, insurance, permits, licenses, taxes, transportation, drayage, hoisting, all other aspects of materials handling, engineering, layout, safety control and regulation compliance to achieve a complete, functioning and workmanlike installation of: **COLD FORMED METAL STUD FRAMING & GYPSUM BOARD** ("Framing & Gypsum Board Work") for the Project.  A true and correct copy of the Framing & Gypsum Board Subcontract Agreement entered

into between WGI and EKE is attached hereto and is incorporated herein by reference as **Exhibit 3**.

10.

On or about January 19, 2015, WGI issued Purchase Order #: 1501-01 to Ton for Ton to provide all the Structural Steel for the Project.  A true and correct copy of the Purchase Order is attached hereto and is incorporated herein by reference as **Exhibit 4**.

11.

Ton was to fabricate the Structural Steel in strict compliance with the Project plans and specifications.

12.

As described in more detail below, the Navy made claims against WGI (constituting a "suit" under the Zurich policies and Florida case law) regarding the defective and deficient work and materials that SMM, EKE, and Ton provided to WGI for the Project.

**B.    The Zurich Policies And Application Of Facts**

13.

Zurich issued three Commercial General Liability policies to WGI (as a named insured) for the Project covering the following periods: (1) CPO6554487-05 for September 30, 2014, to September 30, 2015 (2015 Policy); (2) CPO6554487-06

for September 30, 2015, to September 30, 2016 (2016 Policy); and (3) CPO6554487-07 for September 30, 2016, to September 30, 2017 (2017 Policy) (collectively "Zurich Policies" or "Contract") with the Zurich Policies contain identical policy provisions and language.  A true and correct copy of the 2015 Policy and Certificates of Liability Insurance for 2015, 2016 and 2017 (with the 2016 and 2017 Zurich Policies containing similar, if not the exact language, not being attached hereto for the sake of brevity) are attached hereto and is incorporated herein by reference as **Exhibit 5**.

14.

WGI is named a named insured on the Common Policy Declarations page and/or Certificate of Liability Insurance and is therefore, a named insured under the Zurich Policies:

> **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
>
> Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.
>
> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  The words "we", "us" and "our" refer to the company providing this insurance.
>
> The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

(See **Exhibit 5**, attached hereto).

6

15.

WGI, being a named insured under the Zurich Policies, is entitled to coverage for any amounts that WGI is obligated to pay because of "**property damage**" to which the Zurich Policies apply:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "*property damage*" to which this insurance applies.

        (Emphasis supplied).

(See **Exhibit 5**, attached hereto).

16.

WGI, being a named insured, is entitled to coverage for "**property damage**" caused by an "**occurrence**" in the "**coverage territory**" during the policy periods as provided for under the Zurich Policies:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**

        *       *       *

7

**b.**     This insurance applies to "bodily injury" and "***property damage***" only if:

    **(1)**     The "bodily injury" or "***property damage***" is caused by an "***occurrence***" that takes place in the "***coverage territory***";

    **(2)**     The "bodily injury" or "property damage" occurs during the policy period.

(See **Exhibit 5**, attached hereto).

17.

The Zurich Policies define "**coverage territory**", "**occurrence**" and "**property damage**," in relevant part, to mean:

**SECTION V – DEFINITIONS**

\*     \*     \*

**4.**     "***Coverage territory***" means:

**a.**     The United States of America (including its territories and possessions), Puerto Rico and Canada.

\*     \*     \*

**13.**     "***Occurrence***" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\*     \*     \*

**17.**     "***Property damage***" means

**a.**     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be

8

deemed to occur at the time of the physical injury that caused it; or

**b.**   Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(See **Exhibit 5**, attached hereto).

18.

The Navy's claims against WGI (resulting from the defective and deficient work and materials provided by SMM, EKE, and Ton to WGI for the Project) occurred within the "**Coverage territory**" as defined by the Zurich Policies with the Project being located in Pensacola, Florida, United States, as required under **SECTION V – DEFINITIONS** (Complaint, ¶17, above).

19.

The Navy's claims against WGI constitute an "**Occurrence**" under the Zurich Policies as defined by **SECTION V – DEFINITIONS** (Complaint, ¶17, above) with the defective and deficient work and materials provided by SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) also damaging otherwise non-defective work performed by other trades and the existing structure of the Project for a period of years (but within the Zurich policy periods, September 30, 2014 to September 30, 2017).

20.

The Navy's claims against WGI (described in more detail below) and the millions of dollars spent by WGI to correct the issues with the work and materials provided by SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) constitutes "**Property damage**" under the Zurich Policies as defined by **SECTION V – DEFINITIONS** (Complaint, ¶17, above) with the defective and deficient work and materials provided by SMM, EKE, and Ton for the Project also damaging otherwise non-defective work performed by other trades and to the existing structure resulting in lengthy delays and **loss of use** of the property occurring during the policy periods (September 30, 2014, through September 30, 2017).

21.

WGI was required by the Navy to spend millions of dollars to repair and remedy the defective and deficient work and materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project which also damaged otherwise non-defective work performed by other trades and the existing structure of the Project being defined as "**property damage**" under the Zurich Policies with Zurich being made aware of the amounts spent by WGI on replacement subcontractors and vendors and tacitly and/or expressly consenting to the same.

C. **SMM's Work For The Project**

24.

On or about December 17, 2015, SMM began its Steel Erection Work for the Project.

23.

On or about April 1, 2016, SMM began its Metal Roof Work for the Project.

24.

SMM performed its Steel Erection Work (both initial and repair operations) and/or Metal Roof Work for the Project through about October 1, 2018, with damage to otherwise non-defective work performed by other trades and the existing structure of the Project occurring through April 28, 2018.

D. **EKE's Work For The Project**

25.

On or about January 4, 2016, EKE began its Framing & Gypsum Board Work for the Project.

26.

EKE performed its Framing & Gypsum Board Work (both initial and repair operations) through about September 29, 2017, with damage to otherwise non-defective work and/or the existing structure of the Project occurring through April 28, 2018.

### E.   Ton's Materials For The Project

27.

Ton provided all the Structural Steel for the Project.

28.

Ton was to fabricate and provide the Structural Steel for the Project pursuant to the requirements of the Contract documents, plans and specifications, and details.

29.

The Structural Steel that Ton provided for the Project, however, was deficient, defective and/or incomplete for the following reasons: (1) the Structural Steel was of insufficient gauge or grade not being fabricated as specified by the Project documents; (2) in some instances additional steel (i.e., strap plates, braces, etc.) had to be added to substantiate or strength the steel components that Ton provided for the Project that was already in place but did not meet the requirements of the Project documents; (3) the edges of the Structural Steel were not beveled which made it difficult to weld resulting in increased expenses and delays; (4) Ton did not provide the Hollow Tube Steel frames for the non-courtyard side dwelling unit window and door framing as indicated in the Project documents (Structural Sheet or "S" 501, Detail G). Due to this omission or negligent misinterpretation of the Project documents, WGI had to have these frames redesigned to use light gage metal framing and welded connections at the top of these structures with this welding

damaging some existing framing members.  As a result, spray foam and conduit had to be removed and replaced with work in these areas also damaging adjacent door frames which had to repaired and re-primed; and (5) Ton also failed to provide hold-downs which resulted in delays and increased expense to WGI in having to locate and procure these hold-downs from another source.

### F.    The Navy's Claims Against WGI

30.

On or about November 21, 2016, the Engineer of Record for Naval Facilities Engineering Command Southeast (NAVFAC) or the Navy discovered a portion of the defective and deficient work that SMM (Steel Erection Work) and EKE (Framing & Gypsum Board Work) provided for the Project.

31.

On December 1, 2016, WGI received a *Construction Contract Non-Compliance Notice* No. 001 ("Deficiency Notice No. 1") from the Navy regarding, in part, the work that SMM (Steel Erection Work) and EKE (Framing & Gypsum Board Work) provided for the Project.

32.

On January 26, 2017, WGI received another *Construction Contract Non-Compliance Notice* No. 002 ("Deficiency Notice No. 2") from the Navy regarding,

in part, the work and materials that SMM (Steel Erection Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project.

33.

The Navy and WGI continued to discover additional defective and deficient work and materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided to WGI for the Project which resulted in massive delays and increased expenses.

34.

WGI, formally, as well as informally (by telephone, e-mail, and in person communications), notified SMM of the issues with its defective and deficient Steel Erection and Metal Roof Work that SMM had provided to the Project on the following dates: (a) June 1, 2016 (Notice of Failure); (b) February 7, 2017 (Notice of Delay); (c) February 16, 2017 (Notice of Default); (d) February 23, 2017 (Notice of Default); (e) March 3, 2017 (Notice of Default); and (f) April 5, 2017 (Notice of Default).

35.

WGI formally, as well as informally (by telephone, e-mail, and in person communications), notified EKE of the issues with its defective and deficient Framing & Gypsum Board Work that EKE provided for the Project on the following dates: (a) February 23, 2017 (Notice of Default); (b) April 7, 2017 (Notice of

Default); (c) June 23, 2017 (Notice of Default); (d) June 27, 2017 (Notice of Default); (e) August 1, 2017 (Notice of Default); (f) September 5, 2017 (Notice of Intent to Remedy); (g) September 8, 2017 (Notice of Intent to Terminate); and (h) September 21, 2017 (Notice of Failure to Perform).

36.

WGI formally, as well as informally (by telephone, e-mail, and in person communications), also notified Ton of the issues with its defective and deficient Structural Steel that Ton provided for the Project.

37.

The Navy made *numerous* "**claims**" against WGI regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided to WGI for the Project with the Navy insisting that WGI spend the necessary sums to correct the problems (which totaled millions of dollars constituting "**property damage**" under the Zurich Policies) or face sanctions.

38.

The Navy continued to make "**claims**" against WGI during construction regarding, in part, the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided to WGI for the Project. The Navy, as part of its claims,

15

threatened to terminate and/or assess liquidated damages against WGI in the amount of approximately $3,181.00 per day for each day after May 17, 2017 (the anticipated date of substantial completion), that the Project was not completed (which would have been millions of dollars) resulting, in part, from the defective and deficient work and materials that SMM, EKE, and Ton provided to WGI for the Project.

39.

The Zurich Policies naming WGI as an insured provides coverage for the direct "**claims**" asserted by the Navy against WGI regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project triggering Zurich's obligation to **<u>indemnify</u>** and its **<u>duty to defend</u>** WGI against the Navy's direct claims:

> **SECTION I – COVERAGES**
>
> **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> 1. **Insuring Agreement**
>
>> a. We will ***pay those sums*** that the insured becomes legal obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and ***duty to defend*** the insured against any "suit" seeking those damages . . .
>>
>> (Emphasis supplied) (**Exhibit 5**, attached hereto).

16

40.

The Zurich Policies also provide that WGI is to notify Zurich as soon as practicable of an "**occurrence**" or offense which may result in a "**claim**" or "**suit**":

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

\*     \*     \*

**2.     Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    **a.**   You must see to it that we are notified as soon as practicable of an "***occurrence***" or an offense which may result in a claim.  To the extent possible, notice should include:

        **(1)**   How, when and where the "***occurrence***" or offense took place;

        **(2)**   The names and addresses of any injured persons and witnesses; and

        **(3)**   The nature and location of any injury or damage arising out of the "***occurrence***" or offense.

    **b.**   If a claim is made or "suit" is brought against any insured, you must:

        **(1)**   immediately record the specifics of the claim or "suit" and the date received; and

        **(2)**   Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

(Emphasis supplied) (See **Exhibit 5**, attached hereto).

17

41.

The Zurich Policies also provide that WGI is to send Zurich copies of relevant documents related to the Navy's claims and suit and related to the issues with the Project:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

\*      \*      \*

**2.      Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**c.**      You and any other involved insured must:

(1)      Immediately send us copies of any demands, notices, summonses or legal papers received in connection with this claim or "suit";

(2)      Authorize us to obtain records and other information;

(3)      Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4)      Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

42.

The Zurich Policies also provide that WGI was to get Zurich's consent before making any payments to resolve any claims:

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

\*　　\*　　\*

**2.　　Duties In The Event Of Occurrence, Offense, Claim Or Suit**

\*　　\*　　\*

**d.**　　No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**G.　　<u>Zurich's Handling Of The Navy's Claims</u>**

43.

WGI *fully* cooperated with Zurich by informing and/or assisting with any investigations and provided ***repeated notices*** to Zurich regarding the Navy's claims as well as providing communications with various parties, other **alternative dispute resolution proceedings**, negotiations, papers, Project documentation, **payments** made to correct SMM's and EKE's work and Ton's materials, constituting "**property damage**" under the Zurich Policies as required by the Navy, and ultimate settlement reached with the Navy regarding the Project.

44.

Zurich did not object to, but instead, tacitly and/or expressly consented to WGI's ***payments*** to correct the work as required by the Navy constituting "**property damage**" under the Zurich Policies and the other settlement conditions reached with

19

the Navy through **other alternative dispute resolution proceedings** regarding the claims for the defective and deficient work/materials that SMM (Structural Steel and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided to the Project.

45.

WGI, following its preliminary investigation of the Navy's claims, sent a demand letter to Zurich, among others, notifying Zurich of the Navy's ***direct claims*** against WGI demanding that Zurich ***indemnify*** WGI from Deficiency Notices Nos. 1 – 2, and other claims, pursuant to the terms of the Zurich Policies.

46.

WGI sent ***additional*** and ***repeated*** notices to Zurich regarding the Navy's ***direct claims*** against WGI regarding, in part, the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project which also damaged otherwise non-defective work performed by other trades and the existing structure.

47.

During the ADR Protocol phase of the dispute (discussed in further detail below) at which time WGI was working with the Navy to resolve the Navy's claims, WGI repeatedly invited Zurich to walk the Project site, meet with WGI's Project

manager and other WGI executives to discuss the status of the repairs and the Navy's claims, to take part in, and/or monitor the several rounds of mediations that took place between WGI, SMM, EKE, and others; all of which Zurich failed and refused to do so.  Instead, Zurich took the position that none of the claims were covered under the Zurich Policies despite failing to exercise any due diligence to investigate the situation.

48.

Despite Zurich's position and the policy exclusions for property damage found under (j)(5) and/or (j)(6), the Zurich Policies contain the "Subcontractor's Exception" found under Section (l) which adds coverage back to the j(5) and j(6) exclusions and has not been obviated by any Special Endorsements with the "Subcontractor's Exception" providing:

**2.     Exclusions**

*     *     *

**l.     Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazards."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by it subcontractor.

Additionally, WGI's subcontractors and suppliers damaged adjacent otherwise non-defective work performed by other trades triggering coverage under the Zurich Policies and interpretative case law in Florida, undercutting Zurich's boilerplate and blanketed non-coverage position.

49.

As discussed in more detail below, the Arbitration Panel, through a set of Special Interrogatories, also considered the issues related to damage to adjacent non-defective work performed by other trades and assigned dollar values to various items (with Zurich, despite having notice and an opportunity to do, failed, and refused to take part in any of the multi-phased arbitration hearing).

50.

WGI satisfied *all* the requirements of the Zurich Policies by provided both timely and reasonable notice to Zurich regarding the Navy's ***direct claims*** against WGI regarding, in part, the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board) and Ton (Structural Steel) provided to WGI for the Project.

51.

The Zurich Policies provide that Zurich has a duty to defend WGI against any "**suit**" which are initiated seeking recovery for "**property damage**" with Zurich having the option to investigate and settle any "**claim**" or "**suit**":

22

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.    **Insuring Agreement**

        **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" ***and settle any claim <u>or</u> "suit"*** that may result.

        (Emphasis added) (See **Exhibit 5**, attached hereto).

52.

The Zurich Policies also require Zurich to pay costs associated with WGI's assisting Zurich in investigating any "**claim**" or "**suit**" asserted by the Navy against WGI regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project:

<b>SUPPLEMENTARY PAYMENTS – COVERAGES A AND B</b>

1.    We will pay, with respect to any ***claim*** we investigate **<u>or</u> *settle***, or any "suit" against an insured we defend:

        *      *      *

23

      d.    All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the *claim* or *"suit"*, including actual loss of earnings up to $250 a day because of time off from work.

(Emphasis supplied) (**Exhibit 5**, attached hereto).

53.

While the Navy may not have filed a lawsuit in court or a Demand for Arbitration against WGI for the substandard work/materials provided by SMM, EKE, and Ton, WGI, did in fact, engage in "**other alternative dispute resolution proceedings**" which are defined as a "**suit**" under the Zurich Policies which resulted in a settlement with the Navy.

54.

The Zurich Policies define "**suit**" as meaning:

**SECTION V – DEFINITIONS**

*    *    *

**18.**    "*Suit*" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "*Suit*" includes:

      a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

      b.    Any *other alternative dispute resolution proceeding* in which such damages are claimed and to which the insured submits with our consent.

24

(Emphasis added) (See **Exhibit 5**, attached hereto).

55.

The Zurich Policies are written in such a way that a "**claim**" or "**suit**" are two *separate* and *distinct* events or triggers for coverage.   In other words, the Navy making "**claims**" against WGI regarding the defective and deficient work/materials provided by SMM, EKE, and Ton for the Project is enough for coverage without a traditional "**suit**" having to be filed.

56.

The Navy's Deficiency Notices Nos. 1 and/or 2 *alone* are sufficient to constitute a "**suit**" under the Zurich Policies triggering coverage. In fact, the Supreme Court of Florida in *Altman Contractors, Inc. v. Crum & Forster Specialty*, 232 So.3d 273, 279 (2017), in considering the question certified by the United States Court of Appeals for the Eleventh Circuit as to whether the notice and repair process as provided for in § 558 of the Florida Statutes was a "suit" as defined by the Crum & Forster policy (which is very similar, if not the exact same language, as appearing in Zurich Policies) answered the "question in the **affirmative** and [held] that the notice and repair process set forth in chapter 558 constitutes a 'suit' within the meaning of the commercial general liability policy issued by C & F to Altman. Although the chapter 558 process does not constitute a 'civil proceeding,' it is **included in the policy's definition of 'suit' as an 'alternative dispute resolution**

**proceeding'** to which the insurer's consent is required to invoke the insurer's duty to defend the insured (emphasis added)."

57.

Applying *Altman Contractors, Inc. v. Crum & Forster Specialty*, 232 So.3d 273, 279 (2017), WGI did not have to wait to be sued (in court or an arbitration proceeding) for a "suit" to have been initiated to trigger cover under the Zurich Policies, with WGI instead, mitigating its damages through the settlement with the Navy.

58.

The terms "**claim**" and "**other alternative dispute resolution proceeding**" are **NOT** defined under **SECTION V – DEFINITIONS** of the Zurich Policies. Therefore, "**other alternative dispute resolution proceeding**" could include the continued settlement negotiations that took place between the Navy and WGI over the course of several years in resolution of the Navy's ***direct*** claims against WGI regarding the substandard work/materials that SMM, EKE, and Ton provided for the Project (with WGI making Zurich aware of WGI's settlement discussions and the resolutions reached with the Navy including the millions of dollars that WGI spent to correct SMM's and EKE's work and remedy the materials Ton provided to the Project as required by the Navy with Zurich providing its implied and/or express consent) (**Exhibit 5**, attached hereto).

26

59.

WGI's Prime Contract with the Navy provides that "all work under this contract shall be performed in a skillful and workmanlike manner." Further, the Navy "may require, in writing, that the Contractor remove from the work and employee the Contracting Officer deems incompetent, careless, or otherwise objectionable" (Prime Contract, at Page 42, incorporating FAR 52.236-5(c) – Material and Workmanship).

60.

As mentioned above, during construction, the Navy issued WGI two deficiency Notices Nos. 1 and 2, alleging certain deficiencies, defects, and damage to the Project.

61.

WGI was required under the Prime Contract to "proceed diligently with performance of [the] contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer" (Prime Contract, at Page 42, incorporating FAR 52.233-1 Alt I Disputes (Jul 2002) – Alternate I).

62.

The Prime Contract provides that if WGI refused to proceed with its work at the time that the Navy made its demands, WGI would have been further exposed to additional damages:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its *sureties* shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the- work (Prime Contract at Page 42, incorporating FAR 52.249-10(a) Default (Fixed-Price Construction).

63.

The Prime Contract further provides that in the event of a claim, the Navy and WGI, "by mutual consent, may agree to use alternative dispute resolution (ADR)" to resolve such claims (Prime Contract at Page 42, incorporating FAR 52.233-1 Alt I Disputes (Jul 2002) – Alternate I).

64.

The Navy's demands were initiated through the issuance of Deficiency Notices Nos. 1 – 2, pursuant to the Prime Contract. Through the implementation of

the Repair and Recovery Protocol (i.e., the ADR proceeding agreed to by all interested parties), the interested parties, including the Navy, sought for WGI to continue performance of the work, mitigate delay damages, and ultimately allocate liability among the interested parties for the Navy's claims.

### H.    The ADR Protocol

### 65.

WGI's "**other dispute resolution proceeding**" undertaken with the Navy (and other interested parties) to resolve the Navy's *direct* claims against WGI regarding, in part, the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided for the Project included the implementation of a Repair and Recovery Protocol ("ADR Protocol").

### 66.

The ADR Protocol included: (a) an investigation phase, including direct discussions, document exchange, and site inspections with Zurich failing and refusing to send any representatives to walk the site and/or meet with WGI's Project Manager and others despite have notice and ample opportunity to do so; (b) a repair phase, wherein interested parties jointly assisted in the repair process with the repairs being inspected and approved by the Navy; (c) a joinder phase to assess if any additional interested parties needed and/or desired to be added to the dispute

resolution process; (d) a mediation phase to assist in allocating liability among the interested parties for the Navy's claims, and to address any other direct claims between the interested parties (with formal mediations taking place on September 16 – 17, 2019, June 22 – 23, 2020, and January 11, 2022, with additional conversations with the Mediator and/or between the parties taking place before the initial arbitration hearing); and (e) an arbitration phase in the event that mediation was not successful (with WGI filing Demands for Arbitration with the American Arbitration Association under their Construction Industry Rules initiating the consolidated matter styled: *Whitesell-Green, Inc. v. Sheet Metal Masters, Inc., E Kelly Enterprises, Inc., Rudd & Son Welding, Inc., and Ton, Inc*., Case No. 02-19-0003-9880 (the "Arbitration Proceeding").

67.

WGI, when preparing for the mediation phase of the ADR process, requested that all interested parties and their respective carriers, including Zurich, again confirm their acknowledgment and consent to the ADR Protocol with WGI's December 12, 2018, correspondence stating, in relevant part:

> In an effort to resolve the NAVFAC's [Navy] demand (and in turn WGI's demands to potentially responsible parties), a repair and recovery protocol was initiated to mitigate damages, including delay damages . . . As you are aware, while performing the repairs, additional defective work and resulting damage was discovered. WGI reported these issues to NAVFAC, who demanded that the same be addressed. Depending how one may cauterize the various issues at the project, approximately 17 to 20 separate issues were addressed . . .

As we transition into the mediation phase of resolving the NAVFAC's claims and WGI's claims, we feel it is important that parties, and their respective carriers, confirm their understanding of the process and claims being addressed . . . It is for this reason that we have asked parties (and their respective carriers to confirm their agreement to the ADR proceedings).

Each party's acknowledgment and consent simply means (1) each party acknowledges that there is an agreed-upon binding dispute resolution process outlined in their respective contract, (2) each party acknowledges that all parties are proceeding in harmony with the binding dispute resolution provisions within their respective contracts, (3) each party acknowledges that through this process the claims sought to be resolved are ***NAVFAC's claims***, WGI's claims, and any additional claims presented to any potentially responsible party, and (4) each party agrees to actively participate in the process leading up to the mediation and the [arbitration]."

(Emphasis added).

## I.   <u>The Arbitration Proceeding</u>

### 68.

WGI was able to settle the Navy's claims regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board Work), and Ton (Structural Steel) provided to the Project with WGI having to: (a) spend millions of dollars to correct SMM's and EKE's work and remedy the materials Ton provided, which damaged otherwise non-defective work performed by other trades and the existing structure; (b) forego the installation of the ATFP (anti-terrorism force protection) to have the Project completed timely which caused WGI to lose millions of dollars; and (c) provide the Navy with

extended warranty obligations, in exchange for the Navy waiving millions of dollars in liquated damages, and accepting both Buildings with Zurich having knowledge of the same and providing its implied consent.

69.

WGI, after settling its claims with the Navy, took part in an arbitration hearing with SMM, EKE, and Ton (while being a named party, Ton did not participate) being styled: *Whitesell-Green, Inc. v. Sheet Metal Masters, Inc. v. E Kelly Enterprises, Inc. v. Ton, Inc.*, Case Number: 02-19-0003-9880, pending before the American Arbitration Association, Construction Industry Rules ("Arbitration Proceeding") with the first phase beginning on February 21, 2022, and concluding on March 10, 2022.  Before the arbitration hearing began, the carriers for SMM and EKE insisted that the Arbitration Panel answer a set of Special Interrogatories regarding the coverage issues related to the Project, or otherwise, that Zurich was made aware of and would not help draft or provide any assistance.

70.

On May 16, 2022, the Arbitration Panel entered an *Interim Award* in the Arbitration Proceeding.  A true and correct copy of the *Interim Award* is attached hereto and is incorporated herein by reference as **Exhibit 6**.

71.

On June 24, 2022, the Arbitration Panel entered an *Amended Interim Award* in the Arbitration Proceeding.  A true and correct copy of the *Amended Interim Award* is attached hereto and is incorporated herein by reference as **Exhibit 7**.

72.

WGI, after briefing the issue, was determined to be the prevailing party with the Arbitration Panel, on July 25, 2022, entering an *Order on Prevailing Party and Subsequent Procedures* in the Arbitration Proceeding.  A true and correct copy of the *Order on Prevailing Party and Subsequent Procedures* is attached hereto and is incorporated herein by reference as **Exhibit 8**.

73.

A subsequent hearing regarding the amount of attorneys' fees and expenses to be awarded to WGI against SMM, EKE, and Ton (with Ton not participating) took place on April 3 – 5, 2023, with the amount awarded to WGI being included in the *Final Award* issued by the Arbitration Panel on July 7, 2023 (discussed below).

74.

On September 7 – 8, 2022, WGI took part in a hearing with SMM and EKE (with Ton not participating) regarding the Special Interrogatories (that Zurich was made aware and refused to help draft or to provide any assistance or attend the

hearing) to be submitted to and answered by the Arbitration Panel being determinative of the coverage issues related to the Project, or otherwise.

75.

On September 14, 2022, the Arbitration Panel entered an *Order Answering Special Interrogatories* in the Arbitration Proceeding being determinative of, and binding on SMM's and EKE's carriers and Zurich regarding the coverage issues related to the Project, or otherwise.  A true and correct copy of the Order Answering Special Interrogatories is attached hereto and is incorporated herein by reference as **Exhibit 9**.

76.

Zurich, despite having notice and an opportunity to do so, failed to attend or participate in either the initial Arbitration Proceeding taking place between February 21, 2022, through March 10, 2022, or the subsequent hearing on the Special Interrogatories taking place between September 7 – 8, 2022, with the findings and determinations made by the Arbitration Panel being binding on Zurich's positions and defenses in this action, or otherwise.

77.

On July 7, 2023, the Arbitration Panel entered a *Final Award* in the Arbitration Proceeding in favor of WGI and against SMM totaling **$5,545,833.67** broken down as follows: (1) Damages: $4,249,387.42; (2) Attorneys' Fees:

$1,101,942.33; (3) Costs: $141,133.06; and (4) AAA Costs and Arbitrator Compensation and Expenses: $53,370.86. A true and correct copy of the Final Award is attached hereto and is incorporated herein by reference as **Exhibit 10**.

78.

On July 7, 2023, the Arbitration Panel entered a *Final Award* in the Arbitration Proceeding in favor of WGI and against EKE totaling **$5,805,665.80** broken down as follows: (1) Damages: $4,548,274.00; (2) Attorneys' Fees: $1,049,357.17; (3) Costs: $150,951.01; and (4) AAA Costs and Arbitrator Compensation and Expenses: $57,083.62.  See **Exhibit 10**, attached hereto.

79.

On July 7, 2023, the Arbitration Panel entered a *Final Award* in the Arbitration Proceeding in favor of WGI and against Ton totaling **$563,701.38** broken down as follows: (1) Damages: $441,832.33; (2) Attorneys' Fees: $101,573.00; (3) Costs: $14,726.92; and (4) AAA Costs and Arbitrator Compensation and Expenses: $5,569.13.

### J.    **The Declaratory Judgment Actions**

80.

SMM's primary CGL carrier, Admiral Insurance Company ("Admiral"), instead of paying the *Final Judgment*, had previously filed a Declaratory Judgment Action seeking a declaration of its rights and obligations as to SMM and WGI

regarding the Project with the action being styled: *Admiral Insurance Company v. Sheet Metal Masters, Inc., and Whitesell-Green, Inc.*, United States District Court for the Northern District of Florida, Pensacola Division, Civil Action File No. 3:22-cv-08448-TKW-ZCB ("Admiral Declaratory Judgment Action"), resulting in WGI having to incur attorneys' fees and expenses in defending this action and prosecuting its own Counterclaims.

81.

SMM's excess or umbrella carrier, Evanston Insurance Company ("Evanston"), instead of paying the *Final Judgment* upon exhaustion of the underlying Admiral policies, had previously filed a Declaratory Judgment Action seeking a declaration of its rights and obligations as to SMM, WGI, and Admiral regarding the Project with the action being styled: *Evanston Insurance Company v. Sheet Metal Masters, Inc., Whitesell-Green, Inc. and Admiral Insurance Company*, United States District Court for the Northern District of Florida, Pensacola Division, Civil Action File No. 3:23-cv-05257-TKW-ZCB ("Evanston Declaratory Judgment Action"), resulting in WGI having to incur attorneys' fees and expenses in defending this action and prosecuting its own Counterclaims.

82.

EKE's CGL/Excess carrier, Ohio Security Insurance Company ("Ohio Security"), instead of paying the *Final Judgment* had previously filed a Declaratory

36

Judgment Action seeking a declaration of its rights and obligations as to EKE and WGI regarding the Project with the action being styled: *Ohio Security Insurance Company v. E Kelly Enterprises, Inc., and Whitesell-Green,* United States District Court for the Northern District of Florida, Pensacola Division, Civil Action File No. 3:23-cv-24754-TKW-HTC ("Ohio Security Declaratory Judgment Action"), resulting in WGI having to incur attorneys' fees and expenses in defending this action and prosecuting its own Counterclaims.

### K.   Petition To Confirm Arbitration Award

83.

On October 25, 2023, WGI filed a *Petition to Confirm Arbitration Awards and Orders and for Entry of Final Judgment* to confirm the Awards and Orders entered in favor WGE and against EKE, SMM, and Ton initiating the Confirmation Action styled: *Whitesell-Green, Inc. vs. Sheet Metal Masters, Inc., E Kelly Enterprises, Inc., and Ton, Inc.*, Circuit Court of the First Judicial Circuit in and for Escambia County, Florida, Civil Action File No. 2023 CA 003144 ("Confirmation Action").

84.

WGI has performed all conditions precedent to, or those conditions have been waived for, WGI to pursue and obtain the relief sought in this Complaint.

37

## COUNT I
## ACTION FOR BREACH OF CONTRACT

### 85.

WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 84 of this Complaint and reiterates all those allegations.

### 86.

WGI entered into a valid and enforceable Contract with Zurich for Zurich to provide coverage to WGI as a named insured under the Zurich Policies regarding the "**claim**" and "**suit**" (as defined in the Policies) asserted by the Navy related to the Project.

### 87.

Zurich agreed to **indemnify** and **defend** WGI against the ***direct*** claims asserted by the Navy against WGI regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board), and Ton (Structural Steel) provided to WGI for the Project.

### 88.

WGI complied with the Zurich Policies by formally and ***repeatedly*** notifying Zurich of the direct claims asserted by the Navy against WGI regarding the defective and deficient work/materials that SMM, EKE, and Ton provided for the Project.

89.

WGI also *repeatedly* notified Zurich of the sums spent by WGI to remedy the "**property damage**" caused to the Project by SMM's, EKE's and Ton's defective and deficient work/materials and of WGI's ongoing communications and "**other alternative dispute resolution proceeding**" undertaken with the Navy which constitute a "**suit**" under the Zurich Policies and Florida law and ultimate settlement with the Navy with Zurich tacitly and/or expressly consenting to the money spent by WGI to remedy the "**property damage**" to the Project and to remediate WGI's damages and the ADR proceedings undertaken by WGI to resolve the Navy's claims.

90.

Zurich materially breached its Contract with WGI by failing to **defend** and **indemnify** WGI regarding the Navy's claims for defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board), and Ton (Structural Steel) provided to WGI for the Project which also damaged otherwise non-defective work and the existing structure.

91.

The Navy's **direct** claims against WGI clearly fit into the definitions and provisions for coverage under the Admiral Primary Policies constituting a "**suit**"

under the Supreme Court of Florida's Decision in *Altman Contractors, Inc. v. Crum & Forster Specialty*, 232 So.3d 273, 279 (2017).

92.

Despite Zurich's boilerplate and blanketed non-coverage position taken regarding the Navy's direct claims or "**suit**" against WGI and the defective and deficient work/materials provided by WGI's subcontractors, the policy exclusions for property damage found under (j)(5) and (j)(6) are not a bar to recovery given the "Subcontractor's Exception" found under Section (l) and the substantial damage to adjacent otherwise non-defective work performed by other trades (not WGI and its subcontractors), and the interpretative case law in Florida regarding coverage for the work performed by a general contractor's subcontractors, coupled with the Arbitration Panel's September 14, 2022, *Order Answering Special Interrogatories* being determinative of, and binding on Zurich regarding the coverage issues in this action.

93.

WGI had both a "**claim**" and "**suit**" under the Zurich Policies triggering Zurich's contractual obligations to **indemnify** and **defend** WGI as a named insured which did not occur in breach of Contract.

94.

WGI also complied with *all* the Zurich Policy provisions to invoke coverage as a named insured for the **direct** claims and suit asserted by the Navy against WGI, including, but not limited to: (a) notifying Zurich as soon as practicable of an "occurrence" or an offense resulting in a claim under the Zurich Policies; (b) notifying Zurich of how, when, and where the "occurrence" took place; (c) notifying Zurich of the location of the damage arising out of the "occurrence" and inviting Zurich on multiple occasions to tour the Project site, meet with WGI's Project Manager, and WGI's executives and legal counsel (all of which Zurich declined to do); (d) immediately recording the specifics of the Navy's claim and suit against WGI and notifying Zurich of the same in writing; (e) immediately sending copies of notices and other legal papers received or related to the Navy's direct claims or suit against WGI regarding the Project; (f) authorizing Zurich to obtain records and information related to the Navy's direct claims or suit against WGI regarding the Project; (g) cooperating with Zurich in the investigation of the claim or defenses against the Navy's suit; (h) assisting Zurich in the enforcement of WGI's right against the Navy or against WGI's subcontractors (which Zurich did very little to pursue); and (i) obtain Zurich's consent (tacitly and/or expressly) in mitigating WGI's damages in settlement of the Navy's claims and suit regarding the Project.

95.

Despite the foregoing, Zurich materially breached the Contract by failing to **indemnify** and **defend** WGI from the direct claims and suit asserted by the Navy against WGI regarding the defective and deficient work/materials that SMM (Steel Erection and Metal Roof Work), EKE (Framing & Gypsum Board), and Ton (Structural Steel) provided to WGI for the Project which also damaged otherwise non-defective work and the existing structure.

96.

Zurich's material breach of the Contract has resulted in WGI suffering damages in the amount of at least **$5,545,833.67** regarding the defective and deficient Steel Erection and Metal Roof Work that SMM provided for the Project which also damaged otherwise adjacent non-defective work performed by other trades and the existing structure.

97.

Zurich's material breach of the Contract has also resulted in WGI suffering damages in attorneys' fees and expenses incurred in defending against claims and prosecuting WGI's Counterclaims against SMM's primary (Admiral) and excess/umbrella (Evanston) in the Admiral and Evanston Declaratory Judgment Actions.

98.

Zurich's material breach of the Contract has resulted in WGI suffering damages in the amount of at least **$5,805,665.80** regarding the defective and deficient Framing & Gypsum Board Work that EKE provided for the Project which also damaged otherwise adjacent non-defective work performed by other trades and the existing structure.

99.

Zurich's material breach of the Contract has also resulted in WGI suffering damages in attorneys' fees and expenses incurred in defending against claims and prosecuting WGI's Counterclaims against EKE's primary/excess carrier (Ohio Security) in the Ohio Security Declaratory Judgment Action.

100.

Zurich's material breach of the Contract has resulted in WGI suffering damages in the amount of at least **$563,701.38** regarding the defective and deficient Structural Steel that Ton provided for the Project which also damaged otherwise adjacent non-defective work performed by other trades and the existing structure.

101.

WGI has performed all conditions precedent to recover the damages sought in this Count or those conditions precedent have been waived.

**WHEREFORE**, WGI respectfully requests that this Court enter judgment in favor of WGI and against Zurich for Breach of Contract for Zurich's failure to **indemnify** and **defend** WGI from the Navy's direct claims and suit against WGI regarding the defective and deficient work/materials that SMM, EKE, and Ton provided for the Project which also damaged otherwise non-defective work and the existing structure for:

(a) the principal amount of at least **$11,915,200.85**; plus

(b) the attorneys' fees and expenses incurred by WGI in defending the claims and prosecuting its Counterclaims in the Admiral Declaratory Judgment Action, Evanston Declaratory Judgment Action, and Ohio Security Declaratory Judgment Action (with these damages being ongoing);

(c) upon the rendition of judgment or decree in favor of WGI against Zurich in this action an award of WGI's reasonable attorneys' fees for WGI's prosecution of this action pursuant to F.S.A. § 627.428; plus

(d) all costs of this action; plus

(e) such other and further relief as this Court deems just and proper.

## COUNT II
## SPECIFIC PERFORMANCE: ACTION TO COMPEL ZURICH'S COMPLIANCE WITH THE ZURICH POLICY PROVISIONS TO INDEMNIFY AND DEFEND WGI FROM THE NAVY'S CLAIMS AND SUIT AND TO PAY THE FINAL AWARD/JUDGMENT ENTERED AGAINST SMM, EKE, AND TON

102.

WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 84 of this Complaint and reiterates all those allegations.

103.

This is an action for the equitable remedy of specific performance under the Zurich Policies, specifically, and with respect to indemnifying and defending WGI from the Navy's claims as an additional insured (or to pay the related costs); and for coverage and payment of the *Final Award* entered against SMM, EKE, and Ton in the Arbitration Proceeding.

104.

At all times relevant hereto, the Zurich Policies were binding contracts between WGI and Zurich, with WGI being a named insured, with the Zurich Policies covering the work/materials that WGI, SMM , EKE, and Ton provided to the Navy for the Project.

105.

WGI never waived, modified, or rejected the Zurich Policies terms, coverages, or provisions.

45

106.

As evidenced by the facts and circumstances of WGI's claims as a named insured seeking indemnification and a defense from the Navy's claims and suit and for coverage and payment of the *Final Award* issued in the Arbitration Proceeding as alleged herein, WGI, as a named insured, timely and appropriately, invoked its demand for indemnification and a defense of the Navy's claims and suit as required by the Zurich Policies.

107.

Zurich's failure to indemnify and defend WGI as a named insured regarding the Navy's claims and suit and to provide coverage and to pay the *Final Award* issued against SMM, EKE, and Ton, and in favor of WGI in the Arbitration Proceeding (resulting from Zurich's failure to indemnify and defend WGI) pursuant to the terms of the Zurich Policies is a violation of both the policies and Florida law.

108.

Zurich's wrongful refusal to indemnify and defend WGI as a named insured against the Navy's claims and to provide coverage and payment of the resulting *Final Award* issued in favor of WGI and against SMM, EKE, and Ton in the Arbitration Proceeding has left WGI as a named insured without any adequate remedy at law; specifically, WGI has been forced to incur significant time and expense in defending against and settling the Navy's claims and suit regarding the

work/materials that SMM, EKE, and Ton provided for the Project; with SMM, EKE, and Ton being unable/unwilling to satisfy the *Final Award* (soon to be confirmed into a Final Judgment in the Confirmation Proceeding) issued against SMM, EKE, and Ton and in favor of WGI in the Arbitration Proceeding.

109.

WGI's injuries from Zurich's denial or failure to indemnify and defend WGI from the Navy's claims and suit and to provide coverage and paying the resulting *Final Award* issued against SMM, EKE, and Ton and in favor of WGI in the Arbitration Proceeding, cannot be adequately addressed in an action for damages without the Court specifically requiring Zurich to comply with contractual terms of the Zurich Policies.

110.

In accordance with the principles governing an action for specific performance, this Court enjoys jurisdiction over WGI's claim for relief, and, further, has the inherent discretion to require Zurich's compliance with the terms and provisions of the Zurich Policies, an extra-judicial mechanism long sanctioned by Florida courts, in this instant, to pay the resulting damages from Zurich's failure to indemnify and defend WGI from the Navy's claims and suit and to pay the resulting *Final Award* entered against SMM, EKE, and Ton, and in favor of WGI in the Arbitration Proceeding under the Zurich Policies.

**WHEREFORE**, WGI respectfully requests that this Court requires specific performance on the part of Zurich under the Zurich Policies (without WGI receiving a "double recovery") to:

(a)  indemnify and defend WGI's regarding the Navy's claims and suit against WGI regarding the Project, thus paying WGI the principal amount of at least **$11,915,200.85**; or

(b)  pay WGI the *Final Award* (soon to be confirmed into a Final Judgment in the Confirmation Action) entered against SMM, EKE, and Ton, in the Arbitration Proceeding in the principal amount of at least **$11,915,200.85**; plus

(c)  pay the attorneys' fees and expenses incurred by WGI in defending the claims and prosecuting its Counterclaims in the Admiral Declaratory Judgment Action, Evanston Declaratory Judgment Action, and Ohio Security Declaratory Judgment Action (with these damages being ongoing); plus

(d)  award WGI's reasonable attorneys' fees for WGI's prosecution of this action pursuant to F.S.A. § 627.428; plus

(e)  all costs of this action; plus

(f)  such other and further relief as this Court deems just and proper.

## COUNT III
## ACTION FOR DECLARATORY JUDGMENT
## AGAINST ZURICH

### 111.

WGI incorporates herein by reference all allegations contained in Paragraphs 1 through 84 of this Complaint and reiterates all those allegations.

### 112.

This is an action for Declaratory Judgment pursuant to 28 U.S.C.A. § 2201, *et seq.*; specifically, WGI's request for this Court's: (1) declaration of Zurich's and WGI's duties, responsibilities, and rights under the Zurich Policies; (2) declaration of the legal status of Zurich and WGI as concerning the Zurich Policies; and (3) award of all other relief (separate and apart from the damages and/or other forms of relief available to WGI under any other stated Count set forth herein in this Complaint. By way of example, and to the extent that Zurich maintains that Counts I, II or III of this Complaint fail to state viable causes of action concerning the Zurich Policies, this Court should nevertheless exercise its discretion to resolve WGI's claims for indemnification and a defense from the Navy's claims and suit against WGI regarding the Project as a named insured under the Zurich Policies; and for coverage for and payment of the resulting *Final Award* resulting from Zurich's failure to indemnify and defend WGI from the Navy's claims and suit in accordance with those principles that govern actions for declaratory relief.

113.

There exists an ongoing and justiciable dispute between Zurich, on the one hand, and WGI, on the other hand, with respect to the type/extent of coverages, coverage benefits, and/or contractual remedies due WGI, as a named insured under the Zurich Policies under the terms and provisions of the Zurich Policies in light of the particular facts and circumstances described herein in this Complaint.

114.

Given the facts and circumstances surrounding Zurich's failure and refusal to indemnify and defend WGI from the Navy's claims and suit as a named insured; and to provide coverage and payment of the resulting *Final Award* under the Zurich Policies, WGI has genuine concerns that the policy terms and provisions relied upon by Zurich for such refusal are either: (1) ambiguous as written, and/or (2) ambiguous as applied to, and/or in the context of, those facts and circumstances resulting from WGI's claims as a named insured.

115.

WGI, as a named insured, seeking indemnification and a defense of the Navy's claims and suit and for coverage and payment of the resulting *Final Award*, alleging that it has genuine concerns and questions about its legal status, its rights, and the duties of Zurich under the Zurich Policies in the context of the facts and circumstances attendant to the indemnification and defense owed to WGI as a named

insured regarding the Navy's claims and suit against WGI; and coverage/payment of the resulting *Final Award* to WGI as a named insured, under the Zurich Policies; thus, WGI is seeking from this Court a judicial declaration of said rights, duties, and responsibilities.

116.

There exists a present, ascertained set of facts, and/or a present controversy concerning the terms and provisions of the Zurich Policies in the context of the facts and circumstances attendant to the indemnification and defense owed to WGI regarding the Navy's claims and suit; and coverage and payment of the resulting *Final Award* entered in favor of WGI and against SMM, EKE, and Ton in the Arbitration Proceeding resulting from Zurich's failure and refusal to indemnify and defend WGI from the Navy's claims and suit requires this Court's declaration of the obligations and rights of Zurich and WGI under the Zurich Policies.  The aforesaid controversy concerns legal questions and/or other requested forms of relief that are separate and distinct from those disputed questions of fact at issue in the other stated claims for relief set forth herein.

117.

WGI and Zurich have actual and adversarial interests in the Zurich Policies and the indemnification and defense for the Navy's claims and suit owed to WGI, as a named insured; and the coverage/payment of the resulting *Final Award* issued in

favor of WGI and against SMM, EKE, and Ton in the Arbitration Proceeding with these claims/issues being before this Court.

118.

WGI seeks, among other things, this Court's declaration of the obligations and duties owed by Zurich to WGI, as a named insured, regarding the indemnification and defense of the Navy's claims and suit; and the coverage/payment obligations owed by Zurich to WGI regarding the resulting *Final Award* entered in favor of WGI and against SMM, EKE, and Ton in the Arbitration Proceeding under the Zurich Policies resulting from Zurich's failure and refusal to indemnify and defend WGI from the Navy's claims and suit regarding the Project.

119.

In involving this Court's jurisdiction pursuant to 28 U.S.C.A. § 2201, WGI, as a named insured owed indemnification and a defense of the Navy's claims and suit against WGI regarding the Project and as related to the *Final Award*, entered in favor of WGI and against SMM, EKE, and Ton, specifically requests that this Court retain jurisdiction for the purpose of awarding any and all appropriate relief authorized thereunder, including without limitation, all claims for consequential damages and other relief deemed appropriate by this Court.

**WHEREFORE**, WGI respectfully requests that this Court declare the duties, obligations, responsibilities, and rights of Zurich and WGI under the Zurich Policies in this action, including, without limitation, this Court's:

(a)     finding that this Court has jurisdiction over the Parties;

(b)     finding that this Court has jurisdiction over the subject matter;

(c)     finding that the Zurich Policies between Zurich and WGI were in full force and effect at all times relevant to the claims in this action;

(d)     construction of any and all ambiguities in the terms and provisions of the Zurich Policies, either as written or as applied to the instant facts, are interpreted in favor of coverage for those damages being sought by WGI for indemnification and defense of the Navy's claims and suit, and providing coverage and requiring payment of the resulting *Final Award* issued in Arbitration Proceeding as a result of Zurich's failure and refusal to indemnify and defend WGI;

(e)     finding that with respect to WGI's claim, as a named insured, for indemnification and a defense of the Navy's claims and suit; and for coverage and payment of the resulting *Final Award* entered in the Arbitration Proceeding, that WGI has otherwise satisfied all pre- and post-loss conditions contained within the Zurich Policies, or

alternatively, that WGI's compliance with the same has been waived by Zurich;

(f)    finding that given the specific facts and circumstances at issue in this action regarding WGI's claim, as a named insured, for indemnification and a defense of the Navy's claims and suit against WGI totaling at least **$11,915,200.85** that WGI has invoked the Zurich Policies coverage provisions being entitled to full resolution of WGI's claims;

(g)    retention of its jurisdiction to confirm and/or enforce an award to WGI for indemnification and a defense regarding the Navy's claims and suit totaling at least **$11,915,200.85**; and an award for coverage and payment of the resulting *Final Award* totaling at least **$11,915,200.85** issued against SMM, EKE, and Ton and in favor of WGI in the Arbitration Proceeding in accordance with Florida law and/or otherwise adjudicate Zurich's and WGI's rights and responsibilities under the Zurich Policies subsequent to the issuance of said awards (if necessary);

(h)    retention of its jurisdiction for supplemental proceedings pursuant to 28 U.S.C.A. § 2201; and

(i)    adjudication of such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

WGI hereby demands a trial by jury of all issues so triable in this Complaint.

Respectfully submitted this 10th day of May 2024,

**EMMANUEL SHEPPARD & CONDON**

*/s/ H. Wesley Reeder*
H. Wesley Reeder
Florida Bar Number: 195571

*/s/ Alexis L. Mays*
Alexis L. Mays
Florida Bar Number: 112982

*Attorneys for Defendant/Counterclaim
Plaintiff Whitesell-Green, Inc.*

30 South Spring Street
Pensacola, Florida 32502
Telephone: (850) 433-6581
hwr@esclaw.com
amays@esclaw.com